UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TRENWICK AMERICAN REINSURANCE CORP., *Plaintiff*, *v.* UNIONAMERICA INS. CO., *Defendant*. | Civil No. 3:13cv94 (JBA) July 12, 2013 |

**RULING ON DEFENDANT'S MOTION TO DISMISS AND COMPEL ARBITRATION**

Defendant Unionamerica Insurance Company Limited moves [Doc. # 38] to dismiss Plaintiff Trenwick American Reinsurance Corporation's Complaint [Doc. # 1-1], which seeks to permanently enjoin Defendant from commencing arbitration against Trenwick. Defendant asserts that Trenwick should be compelled to arbitrate the parties' dispute because (1) a valid and enforceable arbitration agreement exists between the parties, (2) the Court does not have jurisdiction over the issue of arbitrability, and (3) Trenwick may not "carve out" certain disputes, namely, its statute of limitations defense, from arbitration. For the reasons that follow, Defendant's motion to dismiss and compel arbitration will be granted.

## I. Factual and Procedural Background

The following facts are culled from Plaintiff's Complaint, the documents referenced in and attached to the Complaint, and the proceedings before this Court. The parties are two reinsurance companies. On December 17, 1998, Chartwell and Commercial Casualty Insurance Company of Georgia ("CCIC") entered into a Casualty Excess of Loss Reinsurance Agreement, effective April 1, 1998 through April 1, 1999, whereby Chartwell reinsured a portion of certain insurance policies issued by CCIC. (*See* Compl. ¶ 6.) On August 20, 1999, Chartwell and CCIC entered into another Reinsurance

Agreement, effective April 1, 1999 through April 1, 2000. (*See id.* ¶ 7.) On December 31, 2000, Plaintiff Trenwick and CCIC entered into a Casualty Excess of Loss Reinsurance Agreement, effective April 1, 2000 through May 15, 2001. (*Id.* ¶ 8.) CCIC and Trenwick, for itself in 2000 and as the successor to Chartwell for 1998 and 1999, are the only parties and signatories to these three Reinsurance Agreements. (*Id.* ¶ 9.)

Each Reinsurance Agreement contains an arbitration clause which provides that "any dispute . . . between the Company [CCIC] and any Reinsurer arising out of or in connection with this Agreement, including its formation or actual validity, will be submitted to the decision of a board of arbitration." (*See* Exs. 1, 2, and 3 to Compl. at Article XX at 33.) The Arbitration clause further provides, "[t]o the extent not otherwise mutually agreed or provided for in this Article, the procedures and rules applicable to arbitration under the laws of the State of Georgia, . . . will govern the procedures of the arbitration." (*Id.*)

Article I of each Reinsurance Agreement, which defines "coverage" under the Agreements, provides that "[n]othing herein will in any matter create any obligations or establish any rights against the Reinsurers in favor of any third parties or any persons not parties to this Agreement except as provided in the Insolvency Article and in Schedules C1, C2, C3, and D attached to this Agreement." (Exs. 1, 2, and 3 to Compl. at Art. I.)

Appended to each Reinsurance Agreement as Schedule C3 is a Reinsurance Assumption Agreement, in which Trenwick and CCIC agree that "[i]n the event the Company [CCIC], due to insolvency or financial impairment, fails to pay an obligation under the Quota Share, the Reinsurers agree to pay Unionamerica the excess liability amount due under the Reinsurance Agreement subject to all terms and conditions of said Agreement." (Schedule C3, Agreement at 48.) Plaintiff alleges that Unionamerica is not a

party to the Reinsurance Assumption Agreement (*id.* ¶ 12), and that the Assumption Agreement does not contain an arbitration clause (*id.* ¶ 13).

On January 3, 2013, Unionamerica demanded that Trenwick participate in an arbitration concerning Unionamerica's claim that Trenwick failed to make payments due under the terms of the Reinsurance Assumption Agreement. (*Id.* ¶¶ 16, 18.) Unionamerica selected its arbitrator, and demanded that Trenwick appoint its own arbitrator within 30 days, by February 2, 2013.[1]

Plaintiff's two–count Complaint seeks a temporary and permanent injunction "to prevent illegal arbitration" (Count One), and temporary and permanent injunctive relief because "certain of Unionamerica's claims are barred by the statute of limitations" (Count Two). Plaintiff also sought a Temporary Restraining Order, and a hearing was held, which resulted in the granting of a TRO by the Duty Judge.[2]

---

[1] Defendant's memorandum in support of its motion to dismiss explains further that the dispute between the parties arises out of a "fronting" reinsurance relationship, whereby CCIC wrote general and professional liability insurance on behalf of Unionamerica, and, in turn, Unionamerica passed on these risks . . . entirely to CCIC in return for a specific premium. . . . CCIC, in turn reinsured them through a number of reinsurers, including Trenwick." (Def.'s Mem. Supp. [Doc. # 38-1] at 3–4.) Defendant contends that Trenwick has not paid "its share of balances that are due and owing under the Reinsurance Agreements" (*id.* at 5), and attaches several emails between the parties in support of this assertion. (*See* Exs. F–H to Dahill Decl. [Doc. # 39].)

[2] The Honorable Judge Burns, serving as Duty Judge, concluded that Plaintiff was entitled to a TRO in order to maintain the status quo, because there was no express agreement to arbitrate between the parties (Ruling on Pl.'s Mot. for a TRO ("TRO Ruling") at 2), and that Trenwick would be irreparably harmed "'by being forced to expend time and resources arbitrating an issue that [might] not [be] arbitrable, and for which any award would not be enforceable" (*id.* (citing *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003)). Further, because the Second Circuit "has recognized only limited theories upon which it is willing to enforce an arbitration agreement against a nonsignatory," *Merrill Lynch Inv. Managers*, 337 F.3d at 129, the Court determined that a sufficiently serious question going to the merits was presented, a

In a telephonic status conference and pre-filing conference with the Court, the parties agreed to stay any demand for arbitration and to postpone any hearing on the merits of Plaintiff's request for injunctive relief pending the Court's ruling on Defendant's Motion to Dismiss and to Compel Arbitration. (*See* Joint Stipulation and Consent Order for Stay [Doc. # 41].) The Court gave Plaintiff an opportunity to amend its complaint, which it chose not to do, and scheduled a hearing on Defendant's Motion to Dismiss and to Compel Arbitration.

## II. Discussion

The Federal Arbitration Act provides that:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. The Act establishes a "liberal policy in favor of arbitration as a means to reduce the costliness and delays of litigation." *Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 665 (2d Cir. 1997) (internal quotation marks omitted) (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1,

TRO was warranted, and Unionamerica was temporarily restrained from proceeding with arbitration with respect to the instant payment dispute between the parties until the Court determined whether the dispute is arbitrable. (TRO Ruling at 1–2.)

24 (1983)); *see also Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, 9 F.3d 1060, 1063 (2d Cir. 1993).

In support of its motion, Defendant argues (1) that the arbitration clause contained in the Reinsurance Agreement clearly applies to the parties' dispute; (2) the Court does not have jurisdiction over the issue of arbitrability because it is a matter that the arbitration panel must decide; and (3) Trenwick is improperly attempting to "carve out" certain disputes from arbitration, namely, its statute of limitations defense. In opposition, Plaintiff relies primarily on the fact that Unionamerica is not a party to the Reinsurance Agreement, and contends that accordingly, it may not take advantage of the Agreement's arbitration clause in its dispute against Trenwick.

**A. Jurisdiction Regarding Questions of Arbitrability**

As Defendant asserts that, given the broad language of the arbitration clause, the Court is without jurisdiction to even decide the issue of whether this dispute is arbitrable, the Court first addresses the issue of its own jurisdiction.

"The arbitrability of a given issue is a question for the court unless there is 'clear and unmistakable' evidence from the arbitration agreement, . . . that the parties intended that the question of arbitrability shall be decided by the arbitrator." *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198–99 (2d Cir. 1996). In asserting that there is "clear and unmistakable" evidence showing that the question of arbitrability should be submitted to the arbitrator, Defendant relies on the broad language of the arbitration clause and on *Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205 (2d Cir. 2005), in which the Second Circuit affirmed a district court's conclusion that "as a signatory to a contract containing an arbitration clause and incorporating by reference the AAA Rules, Remote Solution cannot now disown its agreed-to obligation to arbitrate all disputes, including

the question of arbitrability." 398 F.3d at 211. Defendant asserts that Trenwick, like the plaintiff in *Contec*, agreed to arbitrate "any dispute . . . arising out of or in connection with this Agreement," and cannot now disown this obligation, including the issue of arbitrability, in its dispute with Unionamerica.

As an initial matter, the circumstances in *Contec* are too dissimilar to provide "clear and unmistakable" evidence here that arbitrability should be determined by arbitrators and not by the Court. Though Defendant is correct that Plaintiff certainly "agreed to be bound" by the arbitration clause contained in Article XX of the Reinsurance Agreement, as did the plaintiff in *Contec*, 398 F.3d at 211, *Contec*'s agreement expressly incorporated the AAA's Commercial Arbitration Rules, which specifically contemplate that arbitrators should have the power to rule on their own jusrisdiction. It is undisputed that the Reinsurance Agreement and arbitration clause at issue do not incorporate these Rules.

Plaintiff's also asserts that the language of the arbitration clause is sufficiently broad to evince the parties' intent to submit the issue of arbitrability to the arbitration panel. In *PaineWebber*, the Second Circuit considered a broad arbitration clause and found that "[s]everal provisions in the Agreement" evidenced a "clear and unmistakable" intent to arbitrate the issue of arbitrability:

> (a) "[A]ny and all controversies . . . concerning any account, transaction, dispute or the construction, performance, or breach of this or any other agreement . . . shall be determined by arbitration. . . ."(b) "[T]he parties are waiving their right to seek remedies in court . . . ."(c) "[A]ny arbitration under this agreement shall be held under and pursuant to and be governed by the Federal Arbitration Act. . . ."(d) "[A]rbitration shall be governed by the rules of the organization convening the panel. . . ."

*PaineWebber*, 81 F.3d at 1199. In particular, the Second Circuit reasoned that as to section (a) of the agreement at issue:

> The meaning of the first of these provisions is plain indeed: any and all controversies are to be determined by arbitration. The wording is inclusive, categorical, unconditional and unlimited. The words "any and all" are elastic enough to encompass disputes over whether a claim is timely and *whether a claim is within the scope of arbitration*.

*Id.* (emphasis added).

Article XX is not as "unconditional and unlimited" as the language identified in *PaineWebber*. For example, the arbitration clause here requires arbitration "[a]s a condition precedent to any right of action under this Agreement," for "any disputes," including disputes over the Reinsurance Agreement's "formation or actual validity," but the issue of *who* decides arbitrability is not specifically addressed, nor is arbitrability a question related to the Agreement's "formation or actual validity." Further, the parties here, unlike in *PaineWebber*, are not "waiving their right to seek remedies in court." *PaineWebber*, 81 F.3d at 1199.

These significant differences between the arbitration clauses in *Painwebber* and *Contec* and the provision at issue here persuade the Court that there is not "clear and unmistakable evidence" that the parties intended the issue of arbitrability to be determined by the arbitrators. In the absence of such clear and unmistakable evidence, the "arbitrability of a given issue is a question for the court," *see id.* at 1198, and the Court will consider the issue of arbitrability of the parties' dispute.

**B. Arbitrability of the Parties' Dispute**

"[P]rior to compelling arbitration, the district court must first determine two threshold issues that are governed by state rather than federal law: (1) Did the parties enter into a contractually valid arbitration agreement? and (2) If so, does the parties' dispute fall within the scope of the arbitration agreement?" *Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel*, 346 F.3d 360, 365 (2d Cir. 2003). "When interpreting a contract, we

must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result." *United Techs. Corp. v. Am. Home Assur. Co.*, 989 F. Supp. 128, 144 (D. Conn. 1997) (citing *O'Brien v. U.S. Fidelity and Guaranty Co.*, 235 Conn. 837, 843 (1996)).

As to the first issue, Unionamerica contends that even if it is not a party to the Reinsurance Agreements, the language of Schedule C3 "explicitly permit[s] Unionamerica to rely on the terms and conditions of the Reinsurance Agreements—including the arbitration provisions—in situations where, as here, Unionamerica seeks collection of balances against Trenwick." (Def.'s Mem. Supp. [Doc. # 44] at 2.) Schedule C3 provides:

> Unionamerica Insurance Company Limited, . . . has ceded pursuant to Quota Share Reinsurance Agreement AR 11261 ("the Quota Share"), certain risks to the company, which has, in turn, ceded certain portions of that liability to certain reinsurers ("the Reinsurers") under Casualty Excess of Loss Reinsurance Agreement AR 11172, ("the Reinsurance Agreement").
>
> In the event the Company, due to insolvency or financial impairment, fails to pay an obligation under the Quota Share, the Reinsurers agree to pay Unionamerica the excess liability amount due under the Reinsurance Agreement *subject to all terms and conditions of said Agreement*.

(Schedule C3 (emphasis added).) Unionamerica argues that this "cut-through" provision expressly allows it, in the event that CCIC "fails to pay an obligation," to rely on "all terms and conditions of said [Reinsurance] Agreement," including the arbitration provision in Article XX, in seeking payment from the Reinsurers, including Trenwick.[3]

[3] A cut-through provision or clause "permits an original insured to bring an action directly against a reinsurer. . . . The cut through clause enables the insured to look directly to the reinsurer for payment and to avoid dealing with the estate or liquidator of

Plaintiff argues that because Unionamerica is seeking to arbitrate a dispute between Trenwick and Unionamerica, two parties who did not explicitly agree to arbitrate their dispute, Unionamerica's motion to compel arbitration should be denied. Plaintiff also contends that Schedule C3 is not a "cut-through" provision, but is merely a "payee provision" that unambiguously applies only to *Trenwick's* duties as the Reinsurer—i.e., "[t]he phrase 'subject to all terms and conditions of said Agreement' explains under what terms and conditions Trenwick 'agrees to pay.'"[4] (Pl.'s Opp'n [Doc. # 42] at 12.)

Trenwick's assertion that the parties did not agree to arbitrate, merely because Unionamerica is not a party to the Reinsurance Agreement, is without merit, given the plain language of Schedule C3, and the language of Article I of the Reinsurance Agreement, to which Trenwick is a party and which expressly references Schedule C3, i.e., "[n]othing herein will in any manner create any obligations or establish any rights against the Reinsurers in favor of any third parties or any persons not parties to this Agreement *except as provided in . . . Schedule*[] *. . . C3*." (Reinsurance Agreement, Art. I (emphasis added).) Further, the Second Circuit has held that a signatory to an agreement containing an arbitration clause is "estopped from avoiding arbitration with a non-signatory 'when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *Choctaw Generation Ltd. P'ship v. Am.*

---

a bankrupt insurer." Charles F. Corcoran III, *Reinsurance Litigation: A Primer*, 16 West New Eng. L. Rev. 41, 43 (1994).

[4] Plaintiff's assertions that Schedule C3 is a "payee" provision, are belied by the testimony of its own corporate witness at the TRO hearing, who described Schedule C3 as "what's commonly called a cut-through endorsement." (Jan. 29, 2013 Tr. at 37.)

*Home Assur. Co.*, 271 F.3d 403, 404 (2d Cir. 2001) (quoting *Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir.1999)).

Trenwick's interpretation of the multiple contract terms at issue runs contrary to the plain language of Schedule C3. *See Levine v. Advest, Inc.*, 244 Conn. 732, 745–46 (1998) (reasoning, in determining whether the parties intended to arbitrate, "[a]nalysis of the contract focuses on the intention of the parties as derived from the language employed. . . . Where the intention of the parties is clearly and unambiguously set forth, effect must be given to that intent."). To read Schedule C3 as only concerning *Trenwick's* duties under the Agreement is a tortured interpretation of clear language that discusses Unionamerica's rights to receive payment "subject to all terms and conditions" of the Reinsurance Agreement. Thus, looking at the contract and its provisions as a whole, *see United Techs. Corp.*, 989 F. Supp. at 144, based on the language of Schedule C3 and Articles I and XX of the Reinsurance Agreements, the Court concludes that there exists an arbitration agreement between the parties.

Next, the Court must determine whether the parties' claims and defenses fall within the scope of the arbitration provisions. *Cap Gemini Ernst & Young*, 346 F.3d at 365. The arbitration provision of the Reinsurance Agreement applies to "any dispute . . . between the Company and any Reinsurer arising out of or in connection with this Agreement, including its formation or actual validity." (*See* Reinsurance Agreement at 33.) The use of "any" to qualify "dispute" evinces a broad arbitration clause, which gives rise to a presumption of arbitrability. *See Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) ("[T]he agreement plainly states the parties' intent to submit '[a]ll disputes . . . concerning or arising out of' the Representation Agreement to arbitration."). Because Defendant seeks arbitration to collect reinsurance balances from Plaintiff in

accordance with the terms of the Reinsurance Agreements, this dispute "falls within the scope" of the broad arbitration provision contained in the Reinsurance Agreement.

**C. Statute of Limitations**

Finally, Plaintiff maintains that the Court should resolve the statute of limitations issue in Count Two of its Complaint, in which Plaintiff seeks injunctive relief enjoining Defendant from commencing arbitration because the statute of limitations has run under Georgia law. However, this argument does not preclude arbitration of the parties' dispute.

Plaintiff argues that the "Arbitration Provision expressly provides for judicial resolution of statute of limitations issues" (Pl.'s Opp'n at 21), citing to Section 9-9-5 of Georgia's Arbitration Code ("GAC").[5] However, nowhere in the Reinsurance Agreement's arbitration provision is there any mention of this particular section of the GAC. Rather, the arbitration provision simply provides that *"[t]o the extent not otherwise mutually agreed or provided for in this Article*, the procedures and rules applicable to arbitration under the laws of the State of Georgia, . . . will *govern the procedures of the arbitration*." (Reinsurance Agreement at 33 (emphasis added).)

The Supreme Court has held that a choice of law provision contained in an arbitration agreement, without more, cannot impute a specific intent to exclude certain disputes from arbitration. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 59 (1995) ("We think the best way to harmonize the choice-of-law provision with the arbitration provision is to read 'the laws of the State of New York' to encompass

---

[5] Section 9-9-5 of GAC provides:

If a claim sought to be arbitrated would be barred by limitation of time had the claim sought to be arbitrated been asserted in court, a party may apply to the court to stay arbitration or to vacate the award, as provided in this part. The court has discretion in deciding whether to apply the bar.

substantive principles that New York courts would apply, but *not to include special rules limiting the authority of arbitrators*. Thus, the choice-of-law provision covers the rights and duties of the parties, while the arbitration clause covers arbitration; neither sentence intrudes upon the other.") (emphasis added). Further, without express language to the contrary, it is well established in the Second Circuit that "*any* limitations defense—whether stemming from the arbitration agreement, arbitration association rule, or state statute—is an issue to be addressed by the arbitrators." *Shearson Lehman Hutton v. Wagoner*, 944 F.2d 114, 121 (2d Cir. 1991) (emphasis in original); *see also PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996) (finding the words "any and all" in the arbitration clause to be "elastic enough to encompass disputes over *whether a claim is timely*." (emphasis added)).

Because there is nothing in the Reinsurance Agreements to support Plaintiff's argument that the parties intended to carve out certain disputes, such as a statute of limitations defense, for separate judicial determination, this argument must be rejected.

**III. Conclusion**

For the reasons discussed above, Defendant's motion [Doc. # 38] to dismiss and to compel arbitration is GRANTED. The Clerk is directed to close the case.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 12th day of July, 2013.